RM/PCM: USAO #2025R00293
TMS: 12/17/25

USDC - GREENBELT
'25 DEC 19 PM 6:29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| v. | * CRIMINAL NO. 25-cr-392 |
| ROBERT MATTHEW SHINES, | * (Conspiracy to Gather and Deliver National Defense Information, 18 U.S.C. § 794(c); Forfeiture, 18 U.S.C. § 794(d), 21 U.S.C. § 853(p)) |
| Defendant. | |

*******

### INFORMATION

The United States Attorney for the District of Maryland charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Information, unless otherwise indicated:

### Introduction

1. The defendant, **ROBERT MATTHEW SHINES** ("**SHINES**"), resided in Prince George's County, Maryland.

2. **SHINES** held himself out on an online social networking site as the founder of Company 1, an organization whose identity is known to the United States Attorney, where he advertised "strategic advisory services" relating to United States-China relations. In 2023 **SHINES** changed the name of Company 1 to Company 2; Company 2 was an organization whose identity is also known to the United States Attorney, and described his position with Company 2 as a U.S. foreign policy analyst and project manager.

3. Unindicted Co-Conspirator 1 ("UCC-1") and Unindicted Co-Conspirator 2 ("UCC-2") were foreign nationals who communicated with **SHINES** about efforts to recruit United States citizens who worked for federal government agencies to provide "exclusive" information, including classified information and national defense information.

**Background on the People's Republic of China's Intelligence Services**

4. The People's Republic of China ("PRC") Intelligence Services ("PRCIS") encompassed both the civilian and military components of the PRC intelligence program. Civilian intelligence collection was handled by the Ministry of State Security ("MSS"). The MSS was responsible for counterintelligence, foreign intelligence, and political security.

5. The MSS consisted of a central ministry, provincial state security departments, and municipal state security bureaus. Among other things, the MSS and its regional bureaus focused on identifying and influencing the foreign policy of other countries, including the United States. The MSS and its bureaus sought to obtain information on political, economic, and security policies that might affect the PRC, foreign intelligence operations directed at the PRC, and biographical profiles of foreign politicians and intelligence officers.

6. Additionally, the MSS and its bureaus were tasked with conducting clandestine and overt human source operations, of which the United States was a principal target. These operations used trained intelligence officers as well as non-professional collectors called "co-optees." A co-optee was a person who helps to provide a layer of insulation between an intelligence officer and a source, thereby increasing operational security.

7. MSS co-optees operated under a variety of covers, posing as diplomats, journalists, academics, or businesspeople, both within the PRC and abroad. These co-optees were often tasked with spotting, assessing, targeting, collecting, and handling individuals with access to classified, open-source, proprietary, or sensitive information that the PRC government sought to utilize for economic, political, or military decision-making or advantage. Sources or assets were people who agreed to help a foreign intelligence service by providing information to that service in response to taskings or requests from its intelligence officers or agents.

## COUNT ONE
### (Conspiracy to Gather and Deliver National Defense Information)

8. Paragraphs 1-7 of this Information are incorporated by reference and re-alleged as though set forth fully herein.

9. From a time unknown, but no later than June 2021, and continuing through in or about October 2025, in the District of Maryland and elsewhere, including locations outside the jurisdiction of any particular state or district, the defendant,

**ROBERT MATTHEW SHINES,**

did knowingly and unlawfully conspire with UCC-1, UCC-2, and others known and unknown to the United States Attorney, to communicate, deliver, and transmit to a foreign government, to wit, the Government of the People's Republic of China, and representatives, officers, agents, employees, subjects, and citizens thereof, directly and indirectly, documents and information relating to the national defense of the United States, with intent and reason to believe that such documents and information were to be used to the injury of the United States and to the advantage of a foreign nation, namely, the People's Republic of China.

## MANNER AND MEANS OF THE CONSPIRACY

10. It was a part of the conspiracy that **SHINES** gathered, attempted to gather, transferred, and attempted to transfer to UCC-1, UCC-2, and others, documents, reports, and information relating to the national defense of the United States, including classified information, in exchange for money from UCC-1, UCC-2, and others.

11. It was further part of the conspiracy that **SHINES** and UCC-2 discussed methods for gathering and obtaining classified information from current and former U.S. government employees and contractors, including by alternating information between requests for "c info" (classified information) and "non-c" (unclassified) information.

3

12. It was further a part of the conspiracy that **SHINES** communicated with UCC-1 and UCC-2 using encrypted messaging platforms about efforts by **SHINES** to gather and attempt to gather information relating to the national defense of the United States for transmission to UCC-1 and UCC-2.

13. **SHINES** traveled to China and Hong Kong at least seven times between 2017 and 2025. It was further a part of the conspiracy that UCC-2, and possibly others, paid for **SHINES**'s travel expenses. During his trips in October 2024 and May 2025, **SHINES** personally met with UCC-2.

14. It was further part of the conspiracy that **SHINES** coordinated with UCC-2 to obtain funds for his activities through: (a) covert courier payments made in cash within the District of Maryland, where **SHINES** selected the "most secluded" locations, and elsewhere; and (b) through cash payments made to **SHINES** during his travels to China.

15. It was further part of the conspiracy that **SHINES** and UCC-2 discussed methods to avoid detection by U.S. authorities, including ensuring that payments were made in amounts under $10,000 to circumvent U.S. government currency transaction reporting requirements.

## OVERT ACTS

16. In furtherance of the said conspiracy, and to effect the objects thereof, **SHINES** and other conspirators committed overt acts in the District of Maryland and elsewhere, including, but not limited to, the following:

    a. **Communication with UCC-1, UCC-2, and Others**

        i. In or around June 2021, **SHINES** was contacted by UCC-1, who invited **SHINES** to be "part of our research team" for a Taiwan-based policy research center, and indicated, "We prefer you mostly

to recommend federal employees." UCC-1 stated that the most important requirement was that "the information and analysis in your report should be exclusive." **SHINES** asked UCC-1 about compensation, and UCC-1 replied, "We are willing to offer higher remuneration with no upper limit for the high-quality report with exclusive and profound insights."

ii. In or about March 2022, **SHINES** used an online professional networking platform to contact a U.S. government SECRET-level clearance holder (Individual #1), who worked as a contractor at the Missile Defense Agency ("MDA").

iii. Between in or about March 2022 and May 2025, **SHINES** contacted and met with Individual #1 on multiple occasions and sought to obtain classified information from Individual #1.

iv. In or about and between March 2022 and October 2025, **SHINES** communicated with current and former employees and contractors of the U.S. Marine Corps, MDA, and other federal government agencies.

v. From in or about April 2024 to May 2025, **SHINES** strategized with UCC-2 about how to obtain "c info," referring to classified information, from federal government employees and contractors **SHINES** recruited.

vi. On or about November 11, 2024, **SHINES** sent UCC-2 a message in which he stated, "I'd never be able to get a security clearance with

    a polygraph test since I've now formally met your client."

 vii. On or about December 5, 2024, **SHINES** sent UCC-2 a report in which he said that Individual #1 "says that he would not share classified information," with an accompanying note to UCC-2 reporting, "He said no."

 viii. On or about December 6, 2024, **SHINES** wrote to UCC-2 that he had misjudged Individual #1 and that Individual #1 was "a soldier who believes in something bigger than himself. That's why his country trusted him with a security clearance in the first place. He's very similar to you, your colleagues, and your client. And that's why your country trusts all of you with your various security responsibilities. [He]'s not like me, some piece-of-shit mercenary businessman who only believes in money. And that's exactly why I'd never be able to get a security clearance myself and work for the government."

b. **Travel to the PRC**

 i. Since in or about 2017, **SHINES** has traveled to Hong Kong and other locations in the PRC at least seven times.

 ii. From in or about August 2024 to October 2024, **SHINES** communicated with UCC-2 about arrangements for a trip in October 2024.

 iii. In or about October 2024, **SHINES** traveled to Hong Kong from the United States, with side trips to other locations in the PRC. During

6

his travel, **SHINES** met with UCC-2 and an individual who he believed to be in a higher position than UCC-2, saying, "please tell [UCC-2's presumed superior] it was nice meeting him to get clearer directions."

iv. On or about November 2, 2024, **SHINES** sent reimbursement request records to UCC-2.

v. In or about May 2025, **SHINES** again traveled to Hong Kong from the United States, with side trips to other locations in the PRC. During his travel, **SHINES** met with UCC-2 **SHINES** communicated with UCC-2 about arrangements for the trip and UCC-2 and possibly others paid for **SHINES**'s travel.

vi. In or about May 12, 2025, upon returning from his trip to Hong Kong and the PRC, **SHINES** falsely told U.S. Customs and Border Protection ("CBP") personnel during a secondary inspection and interview that he had only traveled to Hong Kong on this trip, that his travel was for leisure, and that he did not meet with anyone else while on this trip. When the CBP reviewed **SHINES**'s passport, revealing entry and exit stamps for mainland China, contradicting his earlier statement, **SHINES** falsely stated that he traveled to Zhuhai, China, alone for vacation, was only there for tourism, and did not meet with anyone.

c. **Payments from the PRC**

i. On or about October 9, 2024, UCC-2 asked **SHINES**, "when you

        get back to US from HK, how much cash can you take, not to arouse unnecessary attention?" **SHINES** replied, "US $9,000".

  ii. On or about April 17, 2025, UCC-2 asked **SHINES**, "how much money can you take back at most after our meeting in May, bro, still 5000?" **SHINES** replied, "Regarding money, less than $10000. I don't trust U.S. officials. If your contact had arrived a few more minutes late in the park last time, I know the police there would've searched my bag and confiscated all the money."

  iii. On or about January 25, 2025, **SHINES** met with a courier at a location at a Maryland park that **SHINES** described as secluded and received a cash payment of $40,000. **SHINES** informed UCC-2, "Count confirmed at 40K and will deposit in safety deposit box Monday morning."

  iv. From in or about July 25 to July 28, 2025, **SHINES** traveled via Amtrak from Maryland to Chicago to meet with a courier to collect additional funds.

18 U.S.C. § 794(c).

## NOTICE OF FORFEITURE

The United States Attorney for the District of Maryland further finds that:

17. Upon conviction of the offense in violation of Title 18, United States Code, Section 794(c) set forth in Count One of this Information, the defendant

**ROBERT MATTHEW SHINES**,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section

794(d):

    a. any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation, and

    b. any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

18. If any of the property described above, as a result of any act or omission of the defendant:

    a. Cannot be located upon the exercise of due diligence;

    b. Has been transferred or sold to, or deposited with, a third party;

    c. Has been placed beyond the jurisdiction of the court;

    d. Has been substantially diminished in value; or

    e. Has been commingled with other property, which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, 794(d)(3).

18 U.S.C. § 794(d)
21 U.S.C. § 853
28 U.S.C. § 2461(c)

JOHN A. EISENBERG  
ASSISTANT ATTORNEY GENERAL  
National Security Division

KELLY O. HAYES /pen  
UNITED STATES ATTORNEY